UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
<u>JACKSONVILLE DIVISION</u>

| | |
|---|---|
| In re<br><br>B.L. JENNINGS, INC., et al.<br><br>Debtors. | Case Nos. 03-04929-3F1 through<br>03-04937-3F1 |
| RKB INVESTMENTS, et al.<br><br>Plaintiffs,<br><br>v.<br><br>BRANDON JAMES MAXFIELD, et al.,<br><br>Defendants. | Adversary No. 03-203 |
| JANICE KAY JENNINGS<br><br>Plaintiff,<br><br>v.<br><br>BRANDON JAMES MAXFIELD, et al.<br><br>Defendants. | Adversary No. 03-345 |
| BRANDON JAMES MAXFIELD,<br><br>Plaintiff,<br><br>v.<br><br>BRYCO ARMS, et al.<br><br>Defendants. | Adversary No. 03-473 |

BRANDON JAMES MAXFIELD,

        Plaintiff,

v.

BRYCO ARMS, et al.

        Defendants.

)
)
)
)
)
)

Adversary No. 04-107

## BRANDON MAXFIELD'S REPLY BRIEF

Brandon James Maxfield submits this brief in reply to the "Trust Debtors' Answer Brief In Opposition To Brandon Maxfield's Post-Trial Brief" and the "Reply Brief of RKB Investments" filed by Debtors in the above-referenced adversary proceedings.

### Introduction

After trial and briefing, it is apparent that there are no really fundamental disputes, though many objections are raised to relief being afforded.

Nowhere do Debtors assert that the money held by RKB Investments and the California Trusts does not actually belong to Bruce Jennings, or that RKB Investments and the California Trusts have any legitimate claim or right to the money, or that there is anything unfair or inequitable about restoring the money to Bruce Jennings' creditors. Debtors instead simply assert that they do not have to give the money back. They are wrong.

It remains effectively undisputed that Bruce Jennings placed a net total of $9,362,679.00 of his personal funds in the name of RKB Investments, that he acted for himself and for RKB Investments, that the money was not a gift but was to be returned to him, that he purposefully left the transfers undocumented and uncharacterized, and that he

has previously sworn both that the transfers were interest-bearing loans and that they were profit-earning investments.

It also remains undisputed that Bruce Jennings' $9,362,679.00 actually earned net after-tax profits of $2,303,308.00 while held by RKB Investments, that undocumented loans accrue 7% annual interest by law, and that RKB Investments owes Bruce Jennings $11,660,412.00 as an investment, or $18,287,952.00 as a loan. It remains undisputed that the currently DISCLOSED assets of RKB Investments and the California Trusts are less than $3,850,706, that the California Trusts are legally responsible for the debts of RKB Investments, that the creditors of Bruce Jennings will be severely prejudiced if his money is not returned, and that RKB Investments and the California Trusts, which continue to be controlled by Bruce Jennings, will be unjustly enriched if relief is not granted.

Debtors' briefs have raised no objection to Brandon Maxfield's spreadsheet valuation of Bruce Jennings' assets held by RKB Investments and the California Trusts, have made no serious attempt to defend the fraudulent Shoreview transaction, have voiced no quarrel with Brandon Maxfield's detailed explanation of the Carter/Cowan transaction, and have abandoned the fraudulent yacht deduction claim first asserted at trial.

Finally, there is no dispute but that Janice Jennings and the Nevada Trusts were participants in the "Jennings Firearms" joint venture that was responsible for the design and manufacture of the defective pistol, and for Brandon Maxfield's catastrophic injuries.

In this reply brief, Brandon Maxfield addresses Debtors' arguments, considering first the brief filed by the California Trusts and the Nevada Trusts ("Trust Debtors"), and then that

filed by RKB Investments, each of which incorporates the other, responding simply in the order that the arguments appear.

### Reply to Brief Filed by Trust Debtors

The Trust Debtors' brief objects to any remedy being afforded under the alter-ego doctrine, constructive trust doctrine, tort law, and/or joint venture theory.

**A.    Reply to Trust Debtors' Objections to Alter Ego Liability of RKB Investments and the California Trusts**

The Trust Debtors first assert that Florida alter-ego law must be applied. This assertion is without merit, for several reasons: First, the case has already been tried under California law, by express stipulation[1]. Second, debtors' assertion that this Court's opinion in *In re Homelands of DeLeon Springs, Inc.*, 190 B.R. 666 (Bankr. M.D. Fla. 1995) mandates application of Florida alter-ego law is incorrect. The *Homelands* conflict was between state

---

[1] Pursuant to this Court's October 3, 2005 "Order Scheduling Pre-Trial Conference and Trial," the Trust Debtors filed their "Plaintiff Trusts' Pretrial Brief" on December 22, 2005, stipulating (at page 7):

"F.  AGREED STATEMENT OF LAW
The Trust Debtors believe the only issue of law that they and Maxfield agree upon is that issues of alter-ego, partnership, joint venture and enterprise will have to be determined under California state law."

RKB Investments' "Pretrial Memorandum" filed December 22, 2005, stipulated (at page 7):

"F.  AGREED UPON ISSUES OF LAW
RKB believes the only issue of law that it and Maxfield agree upon is that issues of alter-ego, partnership, joint venture and enterprise will have to be determined under California state law."

Brandon Maxfield 's "PreTrial Brief" filed December 23, 2005, confirmed (at page 7):

"There appears to be agreement that California law applies to these claims."

and federal law. The rule for state law conflicts is stated in *Hillsborough Holdings Corporation v. Celotex*, 166 B.R. 461 (Bankr. M.D. Fla. 1994): (1) the bankruptcy court applies choice-of-law rules for the state in which it sits; and (2) Florida choice of law rules apply the "most significant contacts" test. *Id.* at 468. *See also Judge v. American Motors Corp.*, 908 F.2d 1565, 1567-68 (11th Cir. 1990). Finally, there are no Florida contacts at all relevant to this alter-ego dispute -- Brandon Maxfield's alter-ego actions were filed in California, all financial transactions between Bruce Jennings and RKB Investments took place in California, all real property was located in California, RKB Investments is a California partnership, the "California Trusts" are California trusts, Bruce Jennings was a California resident, the accident and injury occurred in California, the tort liability arose in California, and Brandon Maxfield has always been a California resident.

The Trust Debtors next assert that the evidence does not support application of the equitable alter-ego remedy. This claim is premised on a limited number of factual assertions, which the Trust Debtors urge repeatedly through a fog of lengthy case-law expositions, and which ignore the evidence and circumstances of this case. Brandon Maxfield addresses each of these assertions in turn:

The Trust Debtors assert repeatedly and incorrectly that Bruce Jennings had no ownership interest in RKB Investments, and that there existed no unity of ownership or interest. Debtors cite no evidence to support this conclusion. In fact, the evidence shows that ALL of the assets held by RKB Investments have belonged to Bruce Jennings since at least 1990, with Bruce Jennings alone taking all the risk of loss, Bruce Jennings managing all the affairs of RKB Investments, and the California Trusts actually owing RKB Investments

money. (Maxfield Brief, Spreadsheet Cell H8). Bruce Jennings selected RKB Investments'

investments (Tr. at 162:7-13), lived in RKB Investments' Crestview and Shoreview

properties (Tr. at 30:2-17), and, when he felt it in his interests, fraudulently transferred RKB

Investments' Shoreview and Clinton properties. It is difficult to conceive a situation

involving a stronger "unity of ownership and interest" than that which exists between Bruce

Jennings and RKB Investments.

The Trust Debtors assert repeatedly and incorrectly that Janice Jennings was "the

designated agent" of RKB Investments, attempting to mask Bruce Jennings' total domination

and control of RKB Investments. The Trust Debtors place sole reliance on a "Statement of

Partnership" recorded in Orange County, California on September 8, 1987 (Debtors' Exhibit

265; Maxfield Exhibit 1306). Their reliance is misplaced. This document has no legal effect

*vis a vis* the partnership itself, but has been held to simply create an estoppel in favor of bona

fide purchasers of partnership real property. See former California Corporations Code

Section 15010.5; *FDIC v. Superior Court* (1997) 54 Cal. App. 4th 337, 345-348. The reality

behind this document is that Bruce Jennings was going to great lengths to avoid California

income taxes, and did not want to be signing papers in California, on behalf of a California

partnership, investing in California real property. Janice Jennings' sole role with RKB

Investments has always been to simply sign papers at Bruce Jennings' direction. (Tr. at

977:25-978:7, 862:4-11).

The Trust Debtors assert repeatedly and incorrectly that the alter ego doctrine should

not be applied here because Jennings and RKB Investments maintained separate books,

records and bank accounts, and filed separate tax returns. This is not the proper focus. The

physical documents may be "separate," but the contents of those documents are most definitely not - - Bruce Jennings' finances are purposefully hidden in the financial records of RKB Investments and the California Trusts. It is entirely undisputed that Bruce Jennings has been placing his personal funds in RKB Investments and the California Trusts since at least 1987; that the California Trusts have carried a negative equity in RKB Investments since at least 1990; and that the books, records and tax returns of Bruce Jennings, RKB Investments, and the California Trusts have completely failed to disclose his interest, whether as loans, investments, debts, payables, receivables, or anything else, but have instead carried Bruce Jennings' assets as those of RKB Investments and the California Trusts.[2] These are "commingled finances," not "separate books and records," and they again illustrate the overwhelming identity between Bruce Jennings and RKB Investments.

The Trust Debtors assert repeatedly and incorrectly that RKB Investments and the California Trusts cannot have been used for improper and/or fraudulent purposes because they were set up and funded before Brandon Maxfield's lawsuit was filed. No such conclusion follows.

First, fraud is not required. *United States v. Healthwin-Midtown Convalescent Hops. & Rehab. Center, Inc.*, 511 F. Supp. 416, 420 (C.D. Cal. 1981) ("[I]t is not necessary that

---

[2] IRS audits of Bruce Jennings' tax returns have repeatedly failed to identify his connection with RKB Investments and the California Trusts (Tr. at 845:3-6), which have never been separately audited (Tr. at 844:23-845:2). Nothing in the tax returns of Bruce Jennings (Maxfield Exhibits 1381-1396), RKB Investments (Maxfield Exhibits 1501-1522) or the California Trusts (eg: Maxfield Exhibits 1347, 1352, 1355-6, 1359, 1365-1374, 1523) reflects their relationship. Indeed, Bruce Jennings' transfers in and out of RKB Investments were carried for tax purposes as additions and deductions from the RKB Investments' partners' individual capital accounts (Tr. at 812:22-813:23).

plaintiff prove actual fraud; it is enough if the failure to pierce the corporation's veil would result in an injustice.") *RRX Indust., Inc. v. Lab-Con, Inc.*, 772 F. 2d 543, 546 (9th Cir. 1985) ("A finding of bad faith . . . is not a prerequisite to the application of the alter ego doctrine.")

Second, California alter-ego law does not care why the entities were originally conceived. The California Supreme Court addressed this point directly in *Mesler v. Bragg* (1985) 39 Cal. 2d 290, 300, explaining:

> The issue is not so much whether, for all purposes, the corporation is the 'alter ego' of its stockholders or officers, *nor whether the very purpose of the organization of the corporation was to defraud the individual who is now in court complaining, as* it is an issue of whether in the particular case presented and for the purposes of such case justice and equity can best be accomplished and fraud and unfairness defeated by a disregard of the distinct entity of the corporate form." (citations) "In the instant case there may well have been various business reasons sufficient to justify and support the formation or continuation of the corporation on the part of defendant. For such purposes, the [corporation] still stands.

[italics added.]

The question is whether Bruce Jennings is today attempting to use the separate existences of RKB Investments and the California Trusts to conceal assets from his creditors. The answer is obviously yes, since it is solely Bruce Jennings' money being held by these entities, and solely Bruce Jennings' decision to refuse repayment.

As metaphorical "pockets" in the "pair of pants" worn by Bruce Jennings, since 1987 Bruce Jennings has moved money from his "personal" pocket for temporary holding in his "RKB Investments" pocket. Whatever the original purpose, the transfers were temporary – the money was always acknowledged to be owed back to Bruce Jennings:

8  Q   And the money that you put in personally to
9  RKB, was that a loan or an investment or a gift to
10 your children?
11 A   *It was not a gift.* I don't know how to
12 properly characterize it, but I could only explain
13 that the money was placed into RKB's bank account, or
14 the money was used to purchase the property and I
15 simply instructed the bank to deed the property to RKB
16 Investments. I'm not sure. That was many years ago.
17 Q   Were there any loan agreements between you
18 and RKB for the money that you put in to RKB?
19 A   There was no formal documentation, but *it*
20 *was never intended that there was a gift or transfer*
21 *of that money to them. It was intended that the money*
22 *be returned to me and/or the property be returned to*
23 *me in the future.*

(Maxfield Exhibit 1783, 49:8-23, italics added) (see
also Tr. at 243:20-244:1)

In February 2002, facing liability for Brandon Maxfield's catastrophic injures, Bruce

Jennings attempted to make his millions disappear, asserting that his "RKB Investments"

pocket had completely repaid his "personal" pocket by moving one of its two biggest assets

(10 Shoreview) to his "Anna Leah Jennings" pocket, and then moving the other (Clinton

proceeds) to his "California Trusts" pocket, leaving his "personal" and "RKB Investments"

pockets virtually empty, and having no claims on each other, or any of his other pockets. This

is a leather-bound textbook attempt to use separate identifies controlled by a single person

to perpetrate a fraud, and an ideal case for application of the alter-ego doctrine.

Finally, the Trust Debtors assert that Brandon Maxfield's status as an unsatisfied

creditor is not enough to invoke the alter-ego doctrine, and that there is no evidence that

treating RKB Investments as separate will cause any injury. The short response is that no one

has ever claimed that the alter-ego doctrine must be applied because Bruce Jennings does not

have money. Rather, the alter ego doctrine must be applied because Bruce Jennings does have money, but is trying to hide it from his creditors. To the extent that Bruce Jennings is successful, Brandon Maxfield will not be compensated for his injuries, and other creditors will remain unpaid.

The Trust Debtors' lengthy exposition of case authorities is unnecessary. None of the cited authorities lays down any controlling point of law, provides a compellingly analogous fact situation, or revives the incorrect factual premises which it is intended to support. Brandon Maxfield addresses each authority briefly below, keeping in mind the admonition of the California court in *Las Palmas v. Las Palmas* (1991) 235 Cal. App. 3d 1220, 1248 that the alter ego doctrine is not driven by any mechanical formulation, but instead by the unique facts and circumstances of each case:

> Because it is founded on equitable principles, application of the alter ego "is not made to depend upon prior decisions involving factual situations which appear to be similar. . . 'It is the general rule that the conditions under which a corporate entity may be disregarded vary according to the circumstances of each case.'" [citations omitted.] Whether the evidence has established that the corporate veil should be ignored is primarily a question of fact which should not be disturbed when supported by substantial evidence.

The obvious difference between the instant case and *In re Homelands of DeLeon Springs, Inc., supra*, aside from its application of Florida law, is that Homelands was not holding Caremost's assets in its own name to keep them from Caremost's creditors. Caremost had no claim at all to Homeland's property. Far from working equity, the IRS's attempt to satisfy Caremost's tax liability from Homelands' bankruptcy estate would have worked an injustice on the creditors of Homelands.

This Court's ruling in *Multimedia Communications v. Webster*, 212 B.R. 1006 (Bankr. M.D. Fla. 1997), was based on Florida law applied to the specific factual circumstances of that case, which did not involve an entity whose entire assets belonged to a debtor but were intentionally reflected on its books and those of the debtor as its own.

The outcome in *Hillsborough Holdings v. Celotex*, *supra*, turned on an intentional fraud requirement under Florida law, which is not applicable in California. Moreover, the factual situation was precisely reversed -- Celotex's creditors were attempting to pierce the corporate veil of its parent company, Jim Walter Corporation, and challenged Celotex's repayment of Jim Walter Corporation funds which were carried on the books of both corporations as loans. In other words, creditors of the borrower were trying to get at assets of the lender and objecting to the borrower's non-preferential repayment of loans as reducing assets available for them. In the instant case, in contrast, the creditors of the lender (Bruce Jennings) are simply trying to recover from the borrower (RKB Investments) monies that were delivered and not repaid, and which neither party has recorded on its books as having ever occurred.

*Sonora Diamond Corp v. Superior Court* (2000) 83 Cal. App. 4th 523, was an attempt to invoke the alter ego doctrine to obtain California jurisdiction over the foreign parent company of a California subsidiary contracting with plaintiff. The court found no evidence of wrongdoing OR injustice was established simply by proof that a parent company made loans to a subsidiary, or that the debtor could not pay its debts. Neither assertion has ever been made here, and the factual situation is again critically dissimilar -- rather than a

third party lending money to a debtor, we have a debtor moving millions of dollars to a claimed third party to keep them from his creditors.

In *Riddle v. Leuschner* (1959) 51 Cal. 2d 574, family members were held to be corporate alter-egos, except the husband, who was found to be merely a salaried corporate employee, owning no stock, holding no ownership interests, and having no share of profits. There was no issue analogous to Bruce Jennings placing personal assets in the name of RKB Investments, or "erasing" his claim for reimbursement, to keep them from his creditors.

*Mid-Century Insurance Company v. Gardner* (1992) 9 Cal. App. 4th 1205, cited by the Trust Debtors, involved an automobile insurance company trying to evade coverage for a corporate vehicle by invoking an exclusion for personal vehicles and claiming that the corporation had a personal alter-ego. The appellate court found no evidence that relief was necessary to avoid an inequitable result.

Finally, in *Gardner v. Rutherford* (1943) 57 Cal. App. 2d 874, the majority shareholder and president of a corporation that assigned its assets for the benefit of creditors then asserted claims for various loans to the corporation, and the court simply found that the evidence did not compel an alter-ego finding.

If Debtors felt compelled to draw a case analogy, the better choice would have been *In re Turner*, 335 B.R. 140 (Bankr. N.D. Cal. 2005), which involved an "asset protection" scheme utilizing a trust, a limited liability company, a phony divorce and property settlement agreement, a debtor continuing to live with his "ex"-wife in the trust's house, etc. The *Turner* court had very little trouble imposing alter-ego liability under these very similar facts.

-12-

Bruce Jennings is trying to use the separate identities of RKB Investments and the California Trusts to conceal assets and defraud his creditors. The alter ego doctrine is an entirely appropriate remedy under the specific circumstances of this case. *See e.g. Mesler v. Bragg Mgt. Co.* (1983) 39 Cal. 3d 290, 301 ("The essence of the alter ego doctrine is that justice be done. 'What the formula comes down to . . . is that liability will be imposed to reach a just result'").

**B.      Reply to Trust Debtors' Objections to Constructive Trust imposed on assets held by RKB Investments and California Trusts**

The Trust Debtors' oppose imposition of a constructive trust, asserting, without any citation of authority, that because a constructive trust is a remedy predicated on a wrongful act or inequity, it requires a prior determination that RKB Investments and the California Trusts are the alter egos of Bruce Jennings. This is not the law.

The alter-ego doctrine and the constructive trust doctrine are distinct equitable remedies, both premised on proof of an underlying inequity, but neither is a prerequisite to the other. The alter ego doctrine holds RKB Investments to be the alter-ego of Bruce Jennings, and therefore jointly responsible for Brandon Maxfield's judgment, while the constructive trust doctrine recognizes that RKB Investments is holding assets in trust for Bruce Jennings, which should be returned and used to satisfy Brandon Maxfield's judgment.

The authorities cited in Brandon Maxfield's opening brief confirm that the constructive trust remedy is available in a wide range of circumstances. California Civil Code Section 2223 (where one "wrongfully detains a thing"); California Civil Code Section 2224 (where one "gains a thing by fraud ...or other wrongful act"); *David Welch Co. v. Erskine &*

-13-

*Tulley* (1988) 203 Cal. App. 3d 884, 894 ("a constructive trust may be imposed in practically any case where there is a wrongful acquisition or detention of property to which another is entitled"). The imposition of a constructive trust also falls within the scope of "any other relief the circumstances may require" in California's fraudulent transfer statutes. *Monastra v. Konica Business Machines, U.S.A., Inc.* (1996) 43 Cal. App. 4th 1628, 1645 ("A constructive trust plainly is a proper remedy under section 3439.07, subdivision (a)(3)").

The constructive trust remedy is ideally suited here: Brandon Maxfield holds a $24 million personal injury judgment against Bruce Jennings; Bruce Jennings doesn't have enough assets in his own name to satisfy this judgment; Bruce Jennings has placed millions of dollars of his personal funds in the names of RKB Investments and the California Trusts to hold and later return, at his discretion; Bruce Jennings and RKB Investments and the California Trusts all agree that the money is owed back to Bruce Jennings[3]; however, RKB Investments and the California Trusts, acting through Bruce Jennings, now refuse to return the money; though they do not assert any legitimate right or claim to the funds; and they do not challenge the unfairness to Bruce Jennings' creditors, and their own unjust enrichment, were the money not returned. Finally, they do not challenge the fairness or effectiveness of

---

[3] At trial, Bruce Jennings and Gary Genske both admitted that RKB Investments owes Bruce Jennings back the money that he transferred in. (Tr. at 466:8-10, 479:2-20, 479:23-480:4, 829:18-21.) The only dispute concerned the amount remaining to be returned. Mr. Genske estimated $1.2 million, based on his limited information that Bruce Jennings had only put in $8,392,423, his assumption that the Shoreview transfer was a legitimate withdrawal, and was worth $6.1 million rather than $3.9 million, his subtraction of Bruce Jennings' claimed yacht purchase, and without crediting Bruce Jennings either with statutory interest, or the millions of dollars of profits actually earned on his money. (Tr. at 812:25-813:8, 824:9-825:23, 826:19-23, 828:15-20, 829:18-830:23.) The actual amount to be returned is reflected in Brandon Maxfield's spreadsheet.

this Court granting the requested relief, and imposing a constructive trust to restore these assets.

**C.      Reply to Trust Debtors' Objections to Joint Venture Liability of RKB Investments and the California Trusts**

The Trust Debtors' assert that the evidence is insufficient to support a finding that Bruce Jennings and RKB Investments were involved in a joint venture.

The Trust Debtors argue that Bruce Jennings had no ownership interest in RKB Investments, that Bruce Jennings did not participate in the management and control of the business, that Bruce Jennings' transfers to RKB Investments could have been simply an investment to be repaid with a share of profits, that Bruce Jennings cannot have been a joint venturer because there was no agreement to share losses, and that Bruce Jennings did not receive any profits or share in any losses, as they are all reflected solely on the tax returns of RKB Investments and the California Trusts.

Noticeably absent from this discussion, or anywhere in Debtors' briefs, is any advice or recommendation to the Court as to how the transactions between Bruce Jennings and RKB Investments should honestly and finally be characterized.  Instead, Debtors object to all characterizations, hoping thereby to evade any remedy.

There is in fact very substantial evidence to support a finding of joint venture. Bruce Jennings previously swore under oath that he invested his money with RKB Investments and was to share in the profits. (Tr. at 59:16-61:10.) That raises a legal presumption of joint venture or partnership (California Corporations Code Section 16202), which Debtors have failed to rebut (F.R.C.P. 301).  From at least 1990, the entire assets and equity of RKB

Investments belonged to Bruce Jennings, and the California Trusts carried negative equity balances (Maxfield Brief, Spreadsheet Cell H8), with no one but Bruce Jennings taking any risk of loss. An agreement to share in the losses need not be explicit, but is implied by law.[4] Bruce Jennings was always in complete control of RKB Investments, with Janice Jennings relegated to signing papers. RKB Investments' taxes were run through the California Trusts not because the arrangement was not a joint venture, but because RKB Investments' books and records purposefully hid Bruce Jennings' involvement. To the extent that RKB Investments and the California Trusts were not simply the alter egos of Bruce Jennings, there is ample evidence that their relation was that of joint venturers.

Once again, none of the case authorities on which the Trust Debtors rely has any bearing on this case.

---

[4] In *Stilwell v. Martin* (1960) 178 Cal. App. 2d 614, 619, the court explained:

"A joint venture is an undertaking by two or more persons jointly to carry out a single enterprise for profit. [Citations omitted.] It has been stated that the elements of a joint venture are: (a) a community of interest in the subject of the undertaking; (b) a sharing in profits and losses; (c) an "equal right" or a "right in some measure" to direct and control the conduct of each other and of the enterprise; and (d) a fiduciary relation between or among the parties. [Citations omitted.] The existence of a joint venture depends on the intention of the parties. [Citations omitted.] A community of interest may exist although the property forming the capital of the adventure is not jointly owned by the parties [citations omitted] and although one of the parties had contributed money, and other property and another skill to the enterprise. [Citation omitted.] Although it is usual to provide for an equal sharing of profits and losses, the parties may agree to an unequal distribution of the profits, or they may agree that all the parties shall participate in the profits and only certain of them in the losses. [Citation omitted.] In addition, the omission of a provision for the sharing of losses in a joint venture is immaterial since in the absence of agreement, the law implies a provision that losses are to be shared among the parties in the same proportion as profits were to have been divided. [Citations omitted.]"

Thus, in *Enos v. Pichacho* (1943) 56 Cal. App. 2d 765, the court held that a company that had lent money to a new corporation, in which it held an option to purchase stock, could not be considered a joint venturer with the existing stockholder until and unless it exercised the option - until it did, it was merely a lender without the ownership interest required for a joint venture. No such clear signpost of ownership has been left by Bruce Jennings in his transactions with RKB Investments..

In *Kalajian v. Menezes* (1995) 36 Cal. App. 4th 573, the court found that the jury had been presented with "ample" evidence of a joint venture, but since the evidence was disputed, rejected appellants' claim that the jury must "necessarily " have found a joint venture.

In *Bank of California v. Connolly* (1973) 36 Cal. App. 3d 350, the court found the evidence sufficient to support the trial courts' finding that no joint venture existed, noting that the existence of a joint venture is a question of fact.

Finally, in *Jones v. Title Guaranty* (1918) 178 Cal. 375, one party claimed authority to bind another through changed escrow instructions, as a partner. The court found no partnership existed, noting that one party made the deal, that he furnished all the money, that there was no arrangement for sharing losses, and the other party was merely a real estate broker whose commission was based on profits.

### D.    Reply to Trust Debtors' Objections to Tort Claims

The Trust Debtors assert that RKB Investments and the California Trusts cannot have any liability for fraudulent transfers unless RKB Investments is first found to be the alter-ego

of Bruce Jennings, and thus a debtor as to Brandon Maxfield. This argument is entirely devoid of merit.

California law very clearly holds ALL participants in a fraudulent transfer responsible for damages. It makes no difference whether one is a debtor, creditor, transferor, transferee, or unrelated third party. Under California law, no one is privileged to participate in a scheme to defraud creditors. *Taylor v. S&M Lamp Company* (1961) 190 Cal. App. 2d 700, 706. ("Equally, a debtor and those who conspire with him to conceal his assets for the purpose of defrauding creditors are guilty of committing a tort and each is liable in damages.") (See also authorities cited in Brandon Maxfield's opening brief, at pages 35-38.) The Trust Debtors' citation to this Court's opinion in *In re Multimedia Communications*, 212 B.R. 1006 (Bankr. M.D. Fla. 1997) is totally inapposite. There is no rationale or legal authority to support the Trust Debtors' claim.

Once again, it is significant that the Trust Debtors do not attempt to argue that they did not participate in the transfers, that the transfers were not fraudulent, or that their behavior was somehow justified or excusable. Instead, they again contend that they cannot be made to pay.

As the Maxfield case approached trial, Bruce Jennings faced massive liability for Brandon Maxfield's catastrophic injuries, as the admitted designer of the defective firearm. Bruce Jennings was holding most of his assets under the name of RKB Investments. The arrangement was deliberately vague, but he was on record that these were not gifts, but his own assets. Everything held by RKB Investments and the California Trusts belonged to Bruce Jennings. The problem - Brandon Maxfield had also sued RKB Investments and the

-18-

California Trusts after tracing Bruce Jennings' funds there.[5] The solution - Bruce Jennings invented an unwritten 1995 divorce obligation, then RKB Investments (Bruce Jennings) had Janice Jennings (Bruce Jennings) sign a fraudulent deed transferring RKB Investments' (Bruce Jennings') Shoreview property to Anna Leah Jennings (Bruce Jennings), then Bruce Jennings and RKB Investments (Bruce Jennings) announced that this exhausted RKB Investments' (Bruce Jennings') debt to Bruce Jennings, then RKB Investments (Bruce Jennings) sold its remaining Clinton property, and transferred the sale proceeds to the California Trusts (Bruce Jennings). Since then, RKB Investments (Bruce Jennings) and the California Trusts (Bruce Jennings) have held all of Bruce Jennings' money under claim of right, and Bruce Jennings, Janice Jennings, and Bruce Jennings and Janice Jennings on behalf of RKB Investments and the California Trusts have repeatedly lied in support of their transparent fraud.

If ever there was a cause of action for fraud and conspiracy to defraud, it is this.

**F.    Reply to Trust Debtors' Objections to Joint Venture Liability of Janice Jennings and the Nevada Trusts**

The Trust Debtors assert that the Nevada Trusts are not liable as joint venturers in the production of the defective firearm that injured Brandon Maxfield, because their relationship with Bryco Arms was simply that of passive stockholders. This argument entirely misses the point.

---

[5] The California trial was trifurcated, with Phase III set to address the liability of RKB Investments and the California Trusts, among others. Debtors filed bankruptcy after the jury returned its verdict in Phases I & II (liability and damages), staying Phase III until the instant trial before this Court.

The Nevada Trusts are jointly and severally liable for Brandon Maxfield's injuries because they were direct participants in what Brandon Maxfield's First Amended Complaint called "JENNINGS FIREARMS." (Brandon Maxfield's First Amended Complaint, para. 12). Whether their relationship with Bryco Arms itself was also as joint venturers, or whether Bryco Arms was simply a corporate vehicle through which the Nevada Trusts participated in the "Jennings Firearms" joint venture, is a secondary issue.

The "Jennings Firearms" joint venture that produced this defective firearm has been identified and established by overwhelming evidence. (Maxfield's opening brief, at pages 40-48.) The evidence shows that Bruce Jennings and Janice Jennings, on behalf of themselves and the Nevada Trusts, reached a classic joint venture agreement. Janice Jennings and the Nevada Trusts were to participate in the joint venture through Bryco Arms, a corporation to be set up for that purpose. The joint venture produced the defectively designed "Jennings Firearms Model 38" pistol that crippled Brandon Maxfield. Bryco Arms did not exist at the time the parties entered into the "Jennings Firearms" joint venture.

The secondary issue arises from the fact that the Nevada Trusts also did not exist at the time of the joint venture agreement, or later when the Bryco Arms stock was issued, and are not listed as shareholders on the stock register or on the stock certificates. Debtors assert that the Nevada Trusts were nevertheless the operative participants, and that it was the Nevada Trusts rather than the Jennings children individually that were contemplated throughout the agreement, stock issuance, etc., pointing to the fact that the Nevada Trusts always paid the taxes and acted like they were the shareholders.

Brandon Maxfield is willing to accept Debtors' claim that the Nevada Trusts, rather than the Jennings children personally, were the parties involved in both the "Jennings Firearms" joint venture and the corporation Bryco Arms. As admitted participants in the overall "Jennings Firearms" joint venture, the Nevada Trusts are liable for Brandon Maxfield's judgment, and it becomes irrelevant whether the Nevada Trusts were also joint venturers with Bryco Arms, rather than simply Bryco Arms shareholders.

The Nevada Trusts were always employed as additional "pockets" for Bruce Jennings' convenience, without regard to any claimed interests of the Jennings children. The actions of Bruce Jennings and Janice Jennings illustrate their true intent: For example -- Bruce Jennings and Janice Jennings used the Nevada Trusts to hold money funneled out of Bryco Arms through the office secretary's personal checking account (CGM - Claudia G. Mellado) to avoid a judgment creditor. (Tr. at 48:22-51:1). This placed the Nevada Trusts at risk for actual and punitive damages for conspiracy to defraud Bryco Arms' creditors. Another example – Bruce Jennings had Janice Jennings take over sole ownership of Bryco Arms, by "buying" the Nevada Trusts' 60% stock share for notes totaling $60,700, which were paid from over $800,000 in distributions then withdrawn from Bryco Arms. (Tr. at 440:20-441:23, 1020:12-15, 1067:25-1070:4). This cheated the Nevada Trusts out of hundreds of thousands of dollars. Another example – in May of 2002, Bruce Jennings and Janice Jennings withdrew the entire corpus of the Rhonda Jennings Nevada Trust, while the trust was a named defendant approaching trial in Brandon Maxfields' lawsuit, supposedly paying the funds over to Rhonda Jennings, without setting aside any litigation reserve, and under circumstances leaving Bruce Jennings unable to say whether Rhonda Jennings had

-21-

even been told of the Maxfield litigation. (Tr. at 449:21-450:15). This put the trust

beneficiary, supposedly Rhonda Jennings, at personal risk for the entirety of any judgment

that Brandon Maxfield might obtain against the expired trust. These are all extreme

examples, but they clearly show that the Nevada Trusts were not being administered for the

benefit of their children. Even today, it is Bruce Jennings, not Janice Jennings the trustee,

whose appointment was requested and who is controlling the Nevada Trusts in these

bankruptcy proceedings.

***

**Reply To Brief Filed by RKB Investments**

RKB Investments mischaracterizes the claims and litigation in ways that set up

technical defenses that it wishes to assert, but which have no bearing on the substance of this

case or the relief sought. Once again, no argument is made that the money held by RKB

Investments and the California Trusts does not actually belong to Bruce Jennings, or that

RKB Investments and the California Trusts have any claim or right to the money, or that

there is anything unfair or inequitable about restoring the money to Bruce Jennings'

creditors. RKB Investments simply asserts that it cannot be made to pay.

A.     **Reply to RKB Investments' Objections to Purported "Loan Theory of**
**Recovery."**

RKB Investments first attempts to characterize this litigation as a "loan collection

action" for breach of an oral loan contract. RKB Investments then asserts that it had no notice

-22-

that this would be an issue at trial, and asserts as defenses that such an action should be barred by the statute of frauds and the statute of limitations.[6]

RKB Investments' tactical mischaracterization misses the mark. This is not a collection action for breach of a loan agreement. Such an action could never be sustained with Bruce Jennings as both lender (individual capacity) and borrower (acting for RKB Investments). Not only could it not be known from minute to minute whether Bruce Jennings would even admit the transfers were loans, but most importantly, since the loans remain unpaid with Bruce Jennings acting on both sides of the transaction, they necessarily remain unpaid with the consent of both borrower and lender, and there is no provable breach.

Instead, this is an action to recover Bruce Jennings' money from the possession of RKB Investments and its partners. This money was held for Bruce Jennings' benefit by RKB

---

[6] RKB Investments also asserts that Brandon Maxfield's opening brief then "completely abandons" this theory when it explains that there is no such thing as an unwritten zero interest loan under California law. This appears to be a simple misunderstanding - the lack of a writing specifying interest terms does not mean that the transfers cannot be loans, but simply that if they were loans, they accrued 7% annual interest as a matter of law.

RKB Investments also takes unnecessary umbrage with the heading in Brandon Maxfield's Brief's Spreadsheet Column "J" (Maxfield Brief p. 11), apparently not understanding that the headings, unlike the cell contents, are merely explanatory, not evidentiary. Column J simply provides a running total of the net personal funds placed in RKB Investments by Bruce Jennings along with the 7% annual interest that would be imputed by law were his money considered a loan. This is presented as an alternative to Column I, which provides a running total of the net personal funds placed in RKB Investments by Bruce Jennings along with the net after-tax profits actually earned on those funds while held by RKB Investments, ie: the actual performance of his money as an investment.

Investments until February of 2002[7], and since then has been held under claim of right by

RKB Investments with Bruce Jennings' consent. It is undisputed that the entire assets of

RKB Investments have belonged to Bruce Jennings since at least 1990, when the California

Trusts' equity in RKB Investments was exhausted by withdrawals (Maxfield Brief,

Spreadsheet cells H7 & H8).

How Bruce Jennings' money came into RKB Investments' possession, whether by

loan or investment, is relevant only in calculating the amount owed. While RKB Investments

has been holding Bruce Jennings' money, the amount his money has actually earned (profits)

has been less than the statutory cost of money (interest). Bruce Jennings purposefully left the

transfers uncharacterized - at times he swore they were interest bearing loans (Tr. at 64:10-

65:9), and at times he swore they were profit accumulating investments (Tr. at 59:16-61:10).

If the transfers are treated as investments, then RKB Investments and the California Trusts

owe Bruce Jennings' estate $11,660,412.00, whereas if they are treated as loans, they owe

Bruce Jennings' estate $18,287,952.00. That is the point of the discussion about loans and

interest.

The further arguments raised by RKB Investments in opposition to the purported

"loan collection action" appear to be irrelevant under these circumstances, but are addressed

briefly below out of an abundance of caution:

---

[7] In February 2002, RKB Investments deeded the Shoreview property to Anna Leah
Jennings in purported satisfaction of Bruce Jennings' divorce obligations to her. This action,
while fraudulent, had the effect of specifically acknowledging the existence of RKB
Investments' debt to Bruce Jennings. Bruce Jennings then announced that this debt had been
extinguished by the Shoreview transfer, releasing his claims against RKB Investments in a
second fraudulent transfer.

RKB Investments' assertion of prejudicial lack of notice that the trial would involve issues concerning characterization of Bruce Jennings' transfers as loans is disingenuous. Quite to the contrary, not only has the issue been raised repeatedly throughout nearly 6 years of state court and bankruptcy court litigation, including depositions, written discovery, motions for summary judgment, discussions between counsel, and in Brandon Maxfield's pretrial brief, but it was also specifically identified by RKB Investments and Bruce Jennings as a major trial issue[8].

---

[8] In its December 22, 2005 Pre-Trial Memorandum, at pages 5-6, RKB Investments advised the Court that "one of the major contested facts" at trial would be:

> "Whether or not all of Bruce Jennings' transfers of money into RKB were loans. If loans, whether or not any claim for repayment Mr. Jennings would have would be unenforceable as being time barred."

Bruce Jennings also specifically acknowledged at trial that he understood this was going to be a litigated issue (TR. at 57:25-58:11):

```
25    Q    Well, Mr. Jennings, let's talk about
 1    properties a little bit then.  You understand that, in
 2    this case, one of the issues is the terms under which
 3    your money and the California trusts' money was applied
 4    and used by RKB.  You understand that, don't you?
 5    A    I do.
 6    Q    In other words, one of the issues that we're
 7    going to be litigating here is whether, when your money
 8    was put into RKB, whether it was to be an
 9    interest-bearing loan or a profit-making investment or
10    something entirely different; isn't that right?
11    A    Yes.
```

Brandon Maxfield's December 23, 2005 Pre-Trial Brief included a detailed discussion (at page 5) of the valuation issues, including loan vs. investment characterization, rate of interest, amounts due under each characterization, etc.

RKB Investments' assertion of the statute of frauds as an affirmative defense to an action on the oral contract between Bruce Jennings and RKB Investments is groundless. The statute relied on by RKB Investments only invalidates oral agreements that *by their express terms cannot possibly be performed within one year.* California Civil Code Section 1624(a)(1); *Plumlee v. Poag* (1984) 150 Cal. App. 3d 541, 548; *White v. Wolfson* (1968) 68 Cal. 2d 336, 343, fn. 2. In addition, full performance by one party takes the transaction out of the statute of frauds (*Blausten v. Bruton* (1970) 9 Cal. App. 3d 161, 85), and as an affirmative defense, the burden of proof rests with RKB Investments. RKB Investments has not proven any term precluding repayment of these transfers within one year, and, whether the transfers were considered loans or investments, it is undisputed that Bruce Jennings fully performed when he transferred his personal funds to RKB Investments.

RKB Investments' assertion of the statute of limitations as a bar to an action on the oral contract between Bruce Jennings and RKB Investments again illustrates Debtors' remedy-avoidance approach -- arguing that Bruce Jennings' money should not go to his creditors because he (Bruce Jennings the individual) did not sue himself (Bruce Jennings obo RKB Investments) for the return of his money, that he placed in RKB Investments, to keep away from his creditors.

More technically speaking, no statute of limitations has even begun to run because no cause of action for breach has yet arisen. RKB Investments' attempt to shoehorn the case within the so-called "demand loan" exception[9] cannot be sustained. RKB Investments

---

[9] "So-called" because such loans actually require no demand; they are due and payable immediately even absent a demand for payment, hence the cause of action and the running of the statute of limitations on an action for breach are said to commence upon the

cannot satisfy its burden of proof by asserting simply that no evidence of a due date was introduced - the exception requires affirmative proof that no repayment terms existed. There is certainly no direct evidence of this, and all of the indirect evidence and logical inferences are to the contrary. Specifically, considering all the surrounding circumstances (*Bank of Nevada v. United States* (1957) 251 F. 2d 820), since the transfer agreement occurred in the brain of a single person (Bruce Jennings) wearing two hats, RKB Investments at all times had the ability to repay, and the money was never repaid, the inference is that there WAS an intention regarding repayment, and that the intention was that the funds NOT be immediately repaid.[10]

In addition, where the gravamen of an action is fraud, whether styled as an action for breach of an oral contract or in any other form, California courts uniformly apply the fraud statute of limitations, California Code of Civil Procedure Section 338(d), under which a three year period of limitations applies, and the cause of action does not accrue "until the discovery, by the aggrieved party, of the facts constituting the fraud." *Agair Incorporated v. Shaeffer* (1965) 232 Cal. App. 2d 513, 516-519, 42 Cal. Rptr. 883; *Security First National Bank v. Ross* (1963) 214 Cal. App. 2d 424, 429-430. RKB Investments' postulated "collection action" for breach of an oral loan contract, like much of the rest of this action, would necessarily be premised on RKB Investments' fraudulent claim, first made in February

---

making of the loan.

[10]  Or considered from another viewpoint, if Bruce Jennings the individual decided not to sue, it must have been with the consent of Bruce Jennings obo RKB Investments, who may be inferred to have waived operation of the statute of limitations.

2002, that it had satisfied its repayment obligations to Bruce Jennings through the fraudulent transfer of its Shoreview property to Anna Leah Jennings. Prior to that, it was entirely undisputed that the assets held by RKB Investments assets belonged to Bruce Jennings[11].

Finally, a written acknowledgment takes a debt out of the statute of limitations. *Tuggle v. Minor* (1888) 76 Cal. 96, 101; *Buescher v. Lastar* (1976) 61 Cal. App. 3d 73; California Code of Civil Procedure Section 360. RKB Investments acknowledged its debt to Bruce Jennings in February 2002, when it delivered a written deed signed by Janice Jennings on behalf of RKB Investments, in favor of Anna Leah Jennings, directly to Bruce Jennings and at his direction, in claimed satisfaction of its debt to him. "[A]n acknowledgment need not be made in express words, but may be implied from any act or statement which necessarily and directly admits or presupposes the existence of the debt, and the obligation to pay it." *Tuggle v. Minor* (1888) 76 Cal. 96,101. *Buescher v. Lastar* (1976) 61 Cal App 3d 73, applied this rule to a time-barred demand note, finding an acknowledgment from several letters: "The unqualified recognition of the legally expired obligation creates by law an implicit waiver of the statue of limitations and a promise by appellant to pay." (61 Cal. App. 3d 73, at 75).

**B.    Reply to RKB Investments' Objections to Tort Liability of RKB Investments, The California Trusts and Janice Jennings**

---

[11] Brandon Maxfield's earliest opportunity to learn of Bruce Jennings' financial machinations came through formal discovery following the filing of his original Complaint in the personal injury action on May 23, 2001. His original complaint in the fraud action was filed less than a year later, well within the three year statutory period, on March 20, 2002.

RKB Investments' brief advances a variety of arguments, none of which afford any defense to the clear tort liability of RKB Investments, the California Trusts, and Janice Jennings arising from their participation in Bruce Jennings' fraudulent February 2002 Shoreview transaction -- designed to simultaneously erase RKB Investments' debt to him and remove the unencumbered Shoreview and Clinton properties from the reach of his creditors.

RKB Investments first complains that there is no evidence of any criminal investigation conducted into the fraudulent Shoreview transfer, feigning outrage at Brandon Maxfield's reference to California Penal Code Sections 531 and 134(a). (Maxfield Brief, page 37, footnote 7). It is inconceivable that RKB Investments believes that the lack of an investigation somehow exonerates its fraudulent behavior. Moreover, in determining whether participants in a fraudulent transfer to avoid creditors have violated a "duty" for purposes of tort liability, or committed a "wrongful act" for purposes of conspiracy law, the fact that the action taken has been expressly criminalized, regardless of whether the actor is a debtor, transferor, transferee, or unrelated third party, is a significant factor. *Gutierrez v. Givens,* 989 F. Supp. 1033, 1043-1044 (S.D. Cal. 1997) ("Plaintiff's ... claim of civil conspiracy...draws support from [Penal Code] Section 531's inclusion of individuals who are not themselves direct parties to the alleged conveyances"); *Taylor v. S&M Lamp Company* (1961) 190 Cal. App. 2d 700, 706 ("Civil liability . . . exists where there has been formed and operated a conspiracy to accomplish by concerted action a criminal or unlawful purpose or a lawful purpose by criminal or unlawful means which results in actual damage").

RKB Investments next asserts that Brandon Maxfield's California complaint fails to state facts supporting a cause of action for common law fraud, and is narrowly limited to the

-29-

recovery of six specific properties. This characterization of the pleading is absurd.

Brandon Maxfield's April 15, 2002 "First Amended Complaint To Set Aside Fraudulent Transfer, For Injunctive Relief, Imposition of Constructive Trusts, *and for Damages*" may have been filed by a personal injury lawyer, in state court, following local pleading rules and conventions[12], rather than by an bankruptcy expert, but the document gives clear notice of the issues, and in almost 6 years of litigation its sufficiency to state a cause of action for fraud and damages has NEVER been challenged.

The First Amended Complaint clearly and sufficiently pleaded facts constituting a tort cause of action for fraud and damages[13], along with CA-UFTA[14] and equitable remedies. Indeed, the state court "Answer" filed by all defendant/debtors jointly, including RKB Investments, specifically recognized the alternative theories and remedies pleaded:

---

[12]  California Code of Civil Procedure Section 425.10 requires "A statement of the facts constituting the cause of action, in ordinary and concise language." A plaintiff is not required to adopt any particular legal theory of recovery, but is entitled to seek any relief consistent with the facts alleged. *County of Santa Clara v. Hayes Company* (1954) 43 Cal. 2d 615, 619-620.

[13]  No one actually reading the complaint could fail to understand that it sought recovery of monetary damages based on fraud and conspiracy to defraud. Thus, the caption gives notice of the intent to seek damages for fraud. Paragraph 8 pleads an intent to defraud, in ways that "include, but are not limited to" several example transactions. Paragraph 8(D) specifically identifies the Shoreview transaction. Paragraph 8(G) specifically alerts the reader that the fraud is not limited to these examples, and prays leave to amend to conform to the proof at trial. Paragraph 11 again alleges fraudulent intent. Paragraph 12 specifically alleges the formation and conduct of a conspiracy. Paragraph 13 alleges "fraud and malicious" action in "conscious disregard of the rights of plaintiff, to defraud plaintiff..." Paragraph 14 alleges general damages proximately caused by defendants actions. Paragraph 15 alleges special damages. Finally, the first prayer for relief is for "general damages," the second is for "special damages," and the tenth is for "punitive and exemplary damages."

[14]  CA-UFTA is not exclusive, but is expressly supplemented by other laws, including the law of fraud. California Code of Civil Procedure Section 3439.10.

affirmative defense 13 asserted that damages (clearly available for common law fraud) are unavailable in actions under CA-UFTA; affirmative defense 14 asserted that attachment (clearly available under CA-UFTA) is unavailable in a cause of action arising under tort; and affirmative defense 16 asserted that Bruce Jennings was entitled to receive the Shoreview property "to divest himself from RKB Investments."

RKB Investments next asserts that various fraudulent transfers identified in Brandon Maxfield's First Amended Complaint, were not pursued at trial or in Brandon Maxfield's opening brief. This Court's January 11, 2006 "Pretrial Order" already memorialized Brandon Maxfield's stipulation not to pursue the Jennings' homesteads or the $500,000 annuity at trial. As to the others, Brandon Maxfield agrees that he elected not to introduce evidence regarding the Corte Portofino transfer or the $155,000 Ferentz note at trial, except to the extent that they impacted on the overall value of RKB Investments' assets and the amounts owed to Bruce Jennings.

RKB Investments next asserts that the fraudulent Shoreview Transaction does not fit the "badges of fraud" identified for illustrative purposes under CA-UFTA, California Civil Code Section 3439.04(b), *even if the Shoreview transfer is admitted to have occurred in February 2002*. Obviously, if the Shoreview transaction is admitted to have occurred in February 2002, which is established by the overwhelming weight of the evidence, then it was fraudulent on its face as there was no 1995 transfer, no "lost deed," no consideration for a "replacement deed," no erasure of debt, etc. RKB Investments impliedly asserts, however, that in the face of such clear fraud, it should still be exonerated if the language of the "badges," drafted with two-party transfers in mind, do not specifically fit the facts of this

three-party fraud. This is nonsense - the "badges" are tools to help identify fraud, not defenses to obvious fraud. *Filip v. Bucerencio* (2005) 129 Cal. App. 4th 825 ("The list of factors is meant to provide guidance to the trial court, not compel a finding one way or the other").

Moreover, the statutory badges most definitely do apply. This was clearly an "insider transfer" (Badge 1), with Bruce Jennings (individual) having Bruce Jennings (RKB Investments) transfer the Shoreview property to Bruce Jennings (Anna Leah Jennings - continued marital relationship), in exchange for Bruce Jennings (individual) releasing the debt owed to him by Bruce Jennings (RKB Investments.) There was "retained possession" (Badge 2), with the Shoreview property title simply moved from Bruce Jennings (RKB Investments) to Bruce Jennings (Anna Leah Jennings.) The February 2002 transfer was certainly "concealed" (Badge 3), as a claimed "replacement" for a non-existent 1995 transfer, allegedly occurring pursuant to an unwritten term of a phoney divorce, residing in a sealed divorce file. All participants had been sued by Brandon Maxfield (Badge 4) and were heading to trial, at the time of the February 2002 Shoreview transfer. Substantially all of RKB Investments' assets (Badge 5), which were the majority of Bruce Jennings non-exempt personal assets, held as the Shoreview and Clinton properties, were removed. The whole point of the Shoreview transaction was to "remove or conceal assets" (Badge 7), disposing of the properties and erasing RKB Investments' debt to Bruce Jennings. There was no "equivalent consideration" (Badge 8), as the unwritten 1995 divorce debt was completely made up. Finally, the transfer rendered Bruce Jennings "insolvent" (Badge 9) for a

"substantial debt," which was the anticipated verdict of up to $60 million for Brandon Maxfield's injuries.

RKB Investments next asserts that Brandon Maxfield settled his case against Anna Leah Jennings for $3 million, apparently attempting to imply some unfairness in holding RKB Investments responsible for its fraudulent misconduct. This is nothing but misleading.

Anna Leah Jennings was a major defendant in Brandon Maxfield's underlying suit for products liability, and like Bruce Jennings, was facing individual liability for Brandon Maxfield's injuries, under alter-ego and joint venture theories. She was also sued in Brandon Maxfield's fraudulent transfer complaint, as the transferee of RKB Investment's Shoreview property, and as a co-conspirator with tort liability for damages.

After the jury had returned a liability verdict in Phase I of the trial, and while Brandon Maxfield's damages (including over $21 million in lifelong medical expenses) were being determined in Phase II, Anna Leah Jennings agreed to pay $3 million to be dismissed from Brandon Maxfield's litigation. Anna Leah Jennings had millions of dollars in personal assets, and was also still holding the fraudulent Shoreview title, which she was considering liquidating to pay the settlement. Brandon Maxfield had no interest in the physical Shoreview property itself, just the value of the property. To avoid any misunderstanding, the settlement agreement (Maxfield Exhibit 1056) expressly stipulated that the settlement money was paid from the assets of Anna Leah Jennings, and not from the assets of Bruce Jennings, RKB Investments, or any other Debtor.

These settlement terms were approved by the trial court, after affording a hearing on noticed motion. None of the Debtors objected to the settlement terms or claimed that the

payment should be allocated to their funds held by Anna Leah Jennings, and Brandon Maxfield dismissed Anna Leah Jennings from both lawsuits. After the jury returned its damages verdict, the trial court heard argument and entered judgment against Bruce Jennings, Bryco Arms, and B.L. Jennings, Inc., pursuant to the "Calculation of Judgment by Court" (Maxfield Exhibit 0312), giving Bruce Jennings a credit for Brandon Maxfield's settlement with Anna Leah Jennings. The credit was for a percentage of funds recovered by plaintiff from a joint tortfeasor, not the full value credit that would have been due for a prior recovery of funds on behalf of Bruce Jennings. No objection was raised on appeal from the judgments. No collateral challenge can be raised three years later in this court.

In short, Brandon Maxfield's settlement with Anna Leah Jennings has no impact on the liability of RKB Investments or any other debtor for the fraudulent Shoreview transfer. Under California law, Brandon Maxfield was free to abandon return of the physical property itself from the transferee, and to pursue damages from the transferor and co-conspirators, against whom the fraudulent transfer action continued. *Monastra v. Konica Business Machines, USA, Inc.* (1996) 43 Cal. App. 4th 1628, 1644-1645; *Qwest v. Weisz*, 278 F. Supp. 2d 1188, 1193 (S.D. Cal. 2003). Indeed, nothing precludes RKB Investments and/or Bruce Jennings from pursuing recovery of the fraudulently transferred Shoreview property or its value from Anna Leah Jennings.

RKB Investments next asserts that it is not a "party for whose benefit the transfer was made" under California Civil Code Section 3439.08(b) and *Qwest Communications v. Weisz*, 278 F. Spp. 2d 1188 (S.D. Cal. 2003), and therefore cannot be directly liable under CA-UFTA. The point is entirely academic, because under the authorities cited in Brandon

-34-

Maxfield's opening brief, and indeed under *Qwest Communications, supra*, RKB

Investments clearly CAN be held liable for the very same conduct under fraud and

conspiracy theories, including as a co-conspirator with the "person for whose benefit the

transfer was made" under CA-UFTA. See *Qwest Communications, supra.*, at 1192-1193.

Even as an academic argument, however, the point is unavailing. RKB Investments

forgets that there were two sides to the fraudulent Shoreview transaction -- the property was

deeded to Anna Leah Jennings and Bruce Jennings announced that this expunged the debt

owed to him by RKB Investments. This purported release of RKB Investments' debt

obligation was itself a "transfer" under CA-UFTA (California Civil Code Section

3439.01(I)). To the extent that RKB Investments is the alter-ego of Bruce Jennings, it is

directly liable for Brandon Maxfield's judgment against him and the point is moot. But to

the extent that RKB Investments has any separate identify, obviously it was also a

"transferee" of the release of debt involved in the Shoreview transaction, and the party who

directly benefitted from that transfer.

RKB Investments next asserts that unless RKB Investments is found to be the "alter

ego" of Bruce Jennings, RKB Investments owes no duty to Brandon Maxfield and cannot be

liable for damages in tort, for conspiracy, or under CA-UFTA.[15]    RKB Investments is

---

[15] RKB asserts: "In the absence of a finding that RKB Investments and its California Trusts Partners are the alter egos of Bruce Jennings, there is simply no debt to Maxfield. RKB Investments and its partners are free to do with their assets as they choose." (RKB Investments' brief, page 16) "[N]o claim for tort or civil conspiracy can be made without first finding alter ego." (RKB Investments' brief, page 16) "Maxfield is not a creditor of RKB Investments or its Partners. There is therefore no duty owed to him. .... Unless and until Maxfield can prove alter ego, there can be no claim for tort, civil conspiracy, or violation of California's UFTA." (RKB Investments' brief, page 17.)

incorrect - the multiple authorities cited in Brandon Maxfield's Brief (pages 34-39), very clearly establish that RKB Investments DOES owe a duty, under multiple statutes and theories, not to assist Bruce Jennings to defraud Brandon Maxfield and other creditors. To the extent that RKB Investments has any separate identity from Bruce Jennings, RKB Investments has intentionally breached that duty, and is liable to Brandon Maxfield in damages.

RKB Investments next asserts that it cannot have been "created, funded and operated" in anticipation of a catastrophic verdict, because it existed for many years before Brandon Maxfield's verdict, and never paid a settlement over $400,000. There are several responses. First, as discussed above, the reason the entity was originally conceived is irrelevant under California law. Second, the assertion is false -- the Bureau of Alcohol Tobacco and Firearms' (BATF) file contains admissions from Bruce Jennings' that he was actively structuring his financial affairs to evade products liability back in 1988 (Maxfield Exhibits 1867); and Mr. Genske made a specific note that the gun company profits were to go to the California Trusts through RKB Investments as rent on the building (Tr. at 341:2-341:25, Maxfield Exhibit 0918.) Third, Bruce Jennings and "Jennings Firearms" have been manufacturing a product that by its nature is certain to cause catastrophic injury if not safely designed. Fourth, Bruce Jennings has admitted that Brandon Maxfield is not the first victim seeking compensation for having been rendered quadriplegic or paraplegic by these dangerously defective guns. (Maxfield Exhibit 1789, 268:20-271:6; Tr. at 666:6-667:15.)

Finally, far from exonerating his fraud, Bruce Jennings' past cheap settlements of major injury cases proves that his asset protection scheme has worked -- the money has been

hidden and the victims have been forced to settle at steep discounts. After years of causing misery and suffering, it has only been now, through a victim able to withstand 6 years of intense litigation, the intensive intervention of California trial and appellate courts, and with the full resources of the Florida federal bankruptcy court and federal appellate courts brought to bear, that Bruce Jennings' has finally been held to account, and that justice can and will be done.

### Conclusion

This is a perfect case for application of a constructive trust, or any of several alternate remedies. The Debtors' assets, disclosed and as yet undisclosed, must be secured for the benefit of Bruce Jennings' creditors.

The assets of debtors RKB Investments and the California Trusts should be returned and administered as part of the bankruptcy estate of Bruce Jennings. These debtors have wrongfully acquired and are wrongfully holding millions of dollars that belong to the bankruptcy estate of Bruce Jennings, and to the victims of the defective "Jennings Firearms" family of guns.

RKB Investments, the California Trusts and Janice Jennings should also be adjudged jointly and severally liable for damages to the creditors of Bruce Jennings' bankruptcy estate based on their participation in a conspiracy to fraudulently transfer assets belonging to Bruce Jennings' bankruptcy estate.

Finally, Janice Jennings and the Nevada Trusts should be adjudged jointly and severally liable with Bruce Jennings, Bryco Arms, and B.L. Jennings, Inc. for injuries and

damages arising from the defective "Jennings Firearms" family of guns, including Brandon

Maxfield's $24 million judgment.

     Respectfully submitted.

                Richard R. Ruggieri, Esq.
                California Bar Number 08706
                1000 Fourth Street, Suite 785
                San Rafael, California 94901
                (415) 457-9382
                (415) 457-9399 (Facsimile)
                rrrlaw@pacbell.net

                    -and-

                **STUTSMAN THAMES & MARKEY, P.A.**

                    */s/ Richard R. Thames*
By_____
                    Richard R. Thames

                Florida Bar No. 0718459
                50 North Laura Street, Suite 1600
                Jacksonville, Florida 32202
                (904) 358-4000
                (904) 358-4001 (Facsimile)
                Rthames@stmlaw.net

                Attorneys for Brandon James Maxfield

## Certificate of Service

I certify that, on November 21, 2006, a true copy of the foregoing memorandum was served by U.S. Mail on the persons listed below. A copy of the memorandum was also filed electronically with the Clerk which in turn will service a notice of filing through the Court's CM/ECF system to those persons listed below who have requested electronic notification of all pleadings filed in these adversary proceedings:

Robert Altman, Esq.
Pine Lake Lodge
5256 Silver Lake Drive
Palatka, Florida 32177
(386) 325-9765 (Facsimile)
robertaltman@bellsouth.net

Aaron R. Cohen, Esq.
6712 Atlantic Blvd.
Jacksonville, Florida 32211-8730
(904) 722-1869 (Facsimile)
acohen60@bellsouth.net

Gregory K. Crews
300 West Adams Street, Suite 200
Jacksonville, FL 32202
fax (904) 634-0812
crewslaw@bellsouth.net

Douglas H. Morford, Esq.
404 Woodstock Drive, Suite 202
Jacksonville, Florida 32207
(904) 396-5890 (Facsimile)

Luca R. Bronzi, Esq.
Hogan & Hartson, LLP
1111 Brickell Avenue
Miami, Florida 33131
(305) 459-6550 (Facsimile)

Richard R. Thames, Esq.
Stutsman & Thames, P.A.
121 W. Forsyth Street, Suite 600
Jacksonville, Florida 32202
(904) 358-4001 (Facsimile)
rrthames@stutsman-thames.com

Jason B. Burnett, Esq.
Gray Robinson, P.A.
50 North Laura Street, Suite 1675
Jacksonville, Florida 32202
(904) 598-9109 (Facsimile)
jburnett@gray-robinson.com

Janice K. Jennings
335 Orchid Hill Lane
Copper Canyon, Texas 73226
(972) 906-7356 (Facsimile)

Joel M. Grist, Jr., Esq.
915 Hill Park, Suite 100-B
Macon, Georgia 31201
(678) 528-8285
trucklawyer@gmail.com

Lee Christie, Esq.
Cline Farrell Christie Lee & Caress
951 North Delaware St.
Indianapolis, IN 46202-3377

Kenneth Marder, Esq.
Taub & Marder
450 Seventh Avenue, 37th Floor,
New York, New York 10123
(212) 967-2105 (Facsimile)

Ronald L. Bergwerk, Esq.
Post Office Box 119
Jacksonville, Florida 32201
(904) 353-1533
No Facsimile
court.bergwerk@speakeasy.net

_____
Attorney